UNITED STATES of America,
Plaintiff–Appellant,

v.

John DOE, a Juvenile, Defendant–
Appellee.

No. 96–10117.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 11, 1996.

Decided Aug. 12, 1996.

Thomas L. LeClaire, Assistant United States Attorney, Phoenix, Arizona, for plaintiff-appellant.

Dana Carpenter, Carpenter & Hamilton, Phoenix, Arizona, for defendant-appellee.

Before: REINHARDT and HALL, Circuit Judges, and MERHIGE, Senior District Judge.*

MERHIGE, Senior District Judge:

The government appeals from an order entered in the United States District Court for the District of Arizona denying its motion, pursuant to the Federal Juvenile Delinquency Act ("FJDA"), 18 U.S.C. § 5032, to transfer defendant, a seventeen-year-old juvenile male, for adult criminal prosecution. We AFFIRM.

I.

On January 7, 1996, defendant was arrested and arraigned before a United States Magistrate Judge. He was charged in an amended juvenile information with first-degree murder, felony murder, second-degree murder, theft of tribal property, burglary and conspiracy to commit burglary. On January 10, 1996, the magistrate judge ordered defendant detained, and the government moved, pursuant to 18 U.S.C. § 5032, to transfer the defendant for adult prosecution. On January 19, 1996, defendant filed a motion to continue, which was granted. On February 15, 1996, the district court conducted a day-long hearing on the motion to transfer.

The record reflects that in the early morning of January 6, 1996, Hoskie Gene ("Gene"), a Navajo Police Officer, had been dispatched to investigate a break-in at a store near Shonto, Arizona, within the Navajo Indian Reservation. When last contacted, Gene was preparing to stop two suspects, defendant and Vincent Cling.[1] The suspects were approximately a half-mile from the store. Gene stopped the two suspects, made initial inquiries, and then accused them of having attempted to break into the store. When Gene tried to handcuff defendant, defendant resisted and Cling attacked Gene. Cling threw Gene to the ground, at which point defendant and Cling began choking him. Once Gene was unconscious, Cling knocked out the squad car's revolving lights, while defendant began striking Gene in the head with a flashlight. Defendant came over to the car and told Cling that the officer was dead. Defendant and Cling then fled in Gene's patrol car, and wrecked the car approximately two miles from where they left Gene's body. Both were arrested later that same day.

Dr. Bruce Kushner, a psychologist who interviewed and performed tests on defendant, testified at the transfer hearing. Dr. Kushner stated that testing indicated defendant is an "immature 17-year-old," who is "neurotic," but not "psychotic." Furthermore, defendant is

very upset about what he sees as his failure to the family. He blames himself for the—his parents' divorce because of the death of his brother, for which he feels responsible, and in my opinion, has never recovered. And then that's a—I think a seminal event in the boy's life.

Dr. Kushner testified that defendant has suffered from depression for a number of years, and that this depression stems from the accidental shooting of his brother.[2] He further explained that defendant has

some pessimism with regard to his ability to change. That is, he's not sure that he can change. He worries about whether he can. That's consistent with the fact that he is—has had relatively little success in his life, and—and he's not—he's concerned about where he fits in.

Finally, Dr. Kushner testified that four years of treatment would reduce the chances of recidivism substantially and give defendant a reasonable prospect of rehabilitation.

On February 28, 1996, the district court entered a Memorandum of Decision and Order denying the government's motion to transfer defendant to adult status. On March 13, 1996, the government filed a notice

---

* The Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

1. Cling had been defendant's wrestling coach, and had a prior conviction for contributing to the delinquency of a minor for selling crack cocaine to juveniles.

2. When defendant was approximately seven years old, he accidentally shot and killed his three-year-old brother.

of interlocutory appeal. Defendant filed a notice of impending speedy trial violation on March 25, 1996, and a motion to dismiss the appeal on April 4, 1996.

## II.

In *United States v. Gerald N.*, 900 F.2d 189, 190 (9th Cir.1990) (per curiam),[3] we held that orders transferring juveniles for adult prosecution are immediately appealable under the collateral order exception described in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). In the instant appeal, we must consider whether orders *denying* transfer of juveniles for adult prosecution are also immediately appealable under the collateral order exception.

■ To qualify as an appealable collateral order, an order must: (1) "conclusively determine the disputed question," (2) "resolve an important issue completely separate from the merits of the action," and (3) "be effectively unreviewable on appeal from a final judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799, 109 S.Ct. 1494, 1498, 103 L.Ed.2d 879 (1989) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457–58, 57 L.Ed.2d 351 (1978)) (footnote omitted); *Gerald N.*, 900 F.2d at 190. We find that all three requirements are met in this case.

There is no doubt that the first two requirements of the *Coopers & Lybrand* test are satisfied. The district court's order denying the government's motion conclusively determines the disputed question, that is, whether the defendant will be tried as an adult, and this issue is completely separate from the merits of defendant's guilt or innocence. As for the third requirement, we find that if the government were not allowed to appeal the district court's order at this time, and were forced to wait until the conclusion of the juvenile adjudication to do so, the government's right to try defendant as an adult would be forever barred by the Double Jeopardy Clause.[4] Therefore, the district court's order denying transfer involves "an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." *United States v. MacDonald*, 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978). Accordingly, we have appellate jurisdiction under the collateral order doctrine to review the order denying transfer.

## III.

■ Defendant argues that the government's appeal of the district court's order violates his speedy trial rights. 18 U.S.C. § 5036 provides that a juvenile under detention must be brought to trial "within thirty days from the date upon which such detention was begun" unless the "additional delay was caused by the juvenile and his counsel, or consented to by the juvenile and his counsel, or would be in the interest of justice in the particular case." Defendant was arrested and arraigned on January 7, 1996, and ordered detained on January 10, 1996. On January 19, 1996, defendant moved for a continuance. The time attributable to his motion does not count towards the thirty-day limit, because it was "caused by the juvenile or his counsel." Accordingly, only the time from January 7 to January 19, twelve days, counts toward the thirty-day time period. Defendant, however, contends that the time following the government's appeal should count towards the thirty-day limit. We disagree.

On March 13, 1996, the government appealed the denial of the motion to transfer. Because the delay was not caused or consented to by defendant or his counsel, it is excludable from the thirty-day period only if it satisfies the "interests of justice" exception. Defendant argues that since district

**3.** *Accord United States v. J.J.K.*, 76 F.3d 870, 871–72 (7th Cir.1996); *United States v. Doe*, 49 F.3d 859, 865 (2nd Cir.1995); *United States v. One Juvenile Male*, 40 F.3d 841, 844 (6th Cir.1994); *United States v. A.R.*, 38 F.3d 699, 701 (3rd Cir.1994).

**4.** *See Breed v. Jones*, 421 U.S. 519, 541, 95 S.Ct. 1779, 1791–92, 44 L.Ed.2d 346 (1975), where the Supreme Court found a double jeopardy violation in the case of a defendant who had been prosecuted in adult court following a juvenile hearing that required an adjudication of the underlying crime.

court calendar congestion is not considered in evaluating the interest of justice exception, neither should appellate court congestion. Defendant, however, fails to recognize the double jeopardy implications of denying an interlocutory appeal by the government. Furthermore, any delay in this case was caused by the government's valid attempt to ensure that the district court did not abuse its discretion in refusing to transfer the defendant. The government has proceeded expeditiously in filing the instant appeal. Therefore, we find that the filing of an appeal in this case was done in the interest of justice, and the time period following the appeal is excludable from the thirty-day period. Accordingly, defendant's speedy trial rights have not been violated.

## IV.

■ The purpose of the FJDA is to "remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." *United States v. Brian N.,* 900 F.2d 218, 220 (10th Cir.1990) (citations omitted). This purpose must be balanced, however, against the need to protect the public from "violent and dangerous individuals and provid[e] sanctions for antisocial acts. And that balance must be struck by the district court in the context of a transfer hearing." *United States v. Alexander,* 695 F.2d 398, 401 (9th Cir.1982) (citation omitted), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2458, 77 L.Ed.2d 1337 (1983).

■ The decision to transfer a juvenile to adult status is within the sound discretion of the district court, and will not be disturbed except upon our finding an abuse of discretion. *Id.; Gerald N.,* 900 F.2d at 191. The district court abuses its discretion "when it fails to make the required ... findings or where the findings it does make are clearly erroneous." *United States v. Nelson,* 68 F.3d 583, 588 (2nd Cir.1995).

■ In determining whether transfer would be in the "interests of justice," 18 U.S.C. § 5032, the district court is constrained to consider and make findings in the record as to each of the following six factors:

(1) the juvenile's age and social background; (2) the nature of the alleged offense; (3) the prior record of the offender; (4) the juvenile's intellectual development and psychological maturity; (5) the nature of and response to past treatment; and (6) the availability of programs designed to treat the juvenile's behavioral problems. 18 U.S.C. § 5032; *Gerald N.,* 900 F.2d at 191. The FJDA does not instruct courts to weigh one factor more heavily than another, and the weight a court assigns each factor is within its discretion. *United States v. One Juvenile Male,* 40 F.3d 841, 845 (6th Cir.1994); *Alexander,* 695 F.2d at 400–01. The district court may balance the factors as it deems appropriate. *United States v. Juvenile Male No. 1,* 47 F.3d 68, 71 (2nd Cir.1995). The government has the burden of establishing that prosecution as an adult is warranted. *Id.*

### a) *Age and Social Background*

Relying on *United States v. Nelson,* 68 F.3d 583 (2nd Cir.1995), the government contends that the district court should have considered defendant's age at the time of the transfer hearing. The district court found that "the juvenile was sixteen years of age at the time of the offense, and he is now seventeen years of age." As the government points out, defendant was three weeks shy of his seventeenth birthday at the time of the alleged offenses, and he was seventeen years and one month old at the time of the hearing. This case is clearly distinguishable from *Nelson,* 68 F.3d at 589, where the Second Circuit found that the district court erred in *refusing* to consider the defendant's age at the time of the transfer hearing—he was 16 at the time of the offense and 19 at the time of the hearing. In the instant appeal, not only did the district court accurately describe defendant's age and consider his age at the time of the transfer hearing, but even assuming it had not, the difference between 16 years and 11 months and 17 years and 1 month (or even 16 and 17) is not nearly as significant as that between 16 and 19.

■ The government also contends that there is no definitive evidence to support the finding that defendant did not receive appropriate psychological counselling following the

accidental shooting of his brother. This contention is without merit. Defendant accidentally shot his three-year old brother when he was approximately seven years old.[5] He was placed in Charter Hospital some seven or eight years later, after he had been suspended from high school for being intoxicated. He received thirty days of counselling for substance abuse, not for depression over his brother's death. Although the counselling may have addressed his depression, at least in part, thirty days of counselling, seven or eight years after the fact, can scarcely be called appropriate treatment. Indeed, defendant's social worker had recommended six months of residential treatment at Charter Hospital, and Dr. Kushner stated that "[t]here's no way that you can treat a kid with this much pathology and this much history of depression ... in 30 days." Defendant himself wanted to stay longer, but he was apparently unable to do so due to a lack of funding. We find no clear error in the district court's findings regarding the defendant's age and social background.

### b) *Nature of the Alleged Offense*

■ We reject the government's contention that the district court did not determine whether the nature of the alleged offense supported or negated transfer. The district court stated in its order that "the circumstances of the homicide are as egregious as one can find...." This statement clearly suggests that the nature of alleged offense

weighed in favor of transfer. Furthermore, a district court is not required to make a specific finding as to whether each of the six factors favors transfer to adult status or juvenile adjudication. The district court need only make specific findings as to the six factors and then balance them.[6] That the district court ultimately believed that the balance of the factors tipped in favor of juvenile adjudication does not mean that the district court failed to recognize that the egregious nature of the offense weighed in favor of transfer.

The government also contends that the district court failed to accord the nature of the offense the appropriate weight. Its reliance on *Nelson*, 68 F.3d at 590, is misplaced. *Nelson* does not require that the offense, if sufficiently serious, be given special weight. It says only that "the heinous nature of the crime ... *may* be accorded special weight." *Id.* (emphasis added). The weight to be given the nature of the offense, or any other factor, is within the discretion of the district court. *One Juvenile Male*, 40 F.3d at 845; *see Gerald N.*, 900 F.2d at 191 (stating that it is not an abuse of discretion for a district court to find one factor more compelling than another).[7]

### c) *Prior Delinquency Record*

The government concedes that defendant did not have a prior delinquency record. Nonetheless, the government disputes the

---

**5.** The record shows that the death of defendant's brother was not discussed by the family. Defendant's grandfather explained that, according to traditional Navajo beliefs, the death of defendant's brother was not a proper subject for discussion because it is disrespectful to speak of the dead and because such tragedies should not be revisited. However, in the last year, defendant participated in a traditional healing ceremony to redirect his life and his thinking. This ceremony appears to represent the only effort to address defendant's emotional problems related to the loss of his brother.

**6.** In *Alexander*, this court quoted extensively from the district judge's decision, which made findings only as to each factor, not a specific statement as to whether each factor weighed in favor of or against transfer. 695 F.2d at 400 n. 3. Similarly, in *Gerald N.*, this court summarized the district judge's findings. 900 F.2d at 191. Those findings, like those of the district court in *Alexander*,

do not include a specific statement as to how each factor weighs.

**7.** The government asserts that the district court's conclusion that the offense did not overcome the presumption in favor of juvenile adjudication is contrary to the 1994 statutory amendments to § 5032. We reject this contention. The 1994 amendments were intended "to allow prosecutors *to seek to prosecute* as adults those juveniles who have committed the serious violent federal felonies of assault or murder...." H.R.Rep. No. 465, 103d Cong., 2d Sess. 3 (1994) (emphasis added). Those amendments were not intended, however, to alter the standard district courts apply in determining whether to grant motions to transfer. *See id.* (stating that the amendments "retain the current law discretion of ... judges to decide to prosecute a juvenile as an adult if such prosecution would not serve the 'interests of justice' as defined in 18 U.S.C. § 5032").

district court's statement that defendant "engaged in anti-social behavior around the school premises: cheating on P.E. warm-up laps, bringing food into the library, swearing in class, and starting a fire." While these activities may not be condoned, they are no more serious than the reprimands received by other students, with the exception of the arson.[8] The government contends that "the record of [defendant's] downward spiral into serious violent crime could not be more documented."

■ The district court's finding is not clearly erroneous. It is clear that defendant has no prior criminal record. While defendant's disciplinary record in high school is by no means exemplary, the district court's finding that it reflected antisocial behavior—as opposed to a downward spiral into violent crime—is not clearly erroneous.

d) *Intellectual and Psychological Development*

In its findings regarding the defendant's intellectual and psychological development, the district court stated:

> Dr. Kushner, a psychologist, administered a series of standardized tests to evaluate the juvenile's psychological makeup. He opined that the juvenile is an immature seventeen-year old ... who is deeply affected by the death of his younger brother. Dr. Kushner attributes this to the lack of professional counselling following the death of his brother. Dr. Kushner further opined that the juvenile is neurotic rather than psychotic and that the juvenile suffers from substance abuse (alcohol).... Dr. Kushner believes the juvenile acts impulsively because he is in a depressed state rather than from antisocial bases.

■ This finding is not clearly erroneous. The district court here correctly describes and credits the testimony of Dr. Kushner, who was the only witness to testify to defendant's intellectual and psychological development, and who the government described at oral argument as having attempted to provide a "fair, balanced analysis" and as having been "remarkably candid." [9]

e) *Past Treatment Efforts and Juvenile's Response*

The government disputes the district court's findings that defendant has demonstrated some success in prior treatment efforts. The district court stated that "[w]hile the psychologist cannot predict the success of any future counselling efforts and he is even pessimistic about the juvenile's aptitude for success, the juvenile demonstrated some success in his previous counselling programs."

■ Preliminarily, we note that Dr. Kushner was not pessimistic about defendant's aptitude for success. Rather, Dr. Kushner stated that *defendant* was somewhat pessimistic about his own ability to change, which Dr. Kushner attributed to defendant's life experiences. As to defendant's prior experience in counselling programs, the district court's finding that defendant demonstrated some success was not clearly erroneous. Defendant successfully completed his thirty-day treatment at Charter Hospital, the only structured treatment that he underwent, and had made initial success at Monument Valley High School.

f) *Availability of Programs to Treat the Juvenile*

The government asserts that all available counselling programs require that the juvenile be amenable to treatment, and that "the

---

8. As to the arson incident, defendant apparently started a fire in English class, setting fire to the bulletin board. The witnesses at the transfer hearing, however, were not aware of the circumstances surrounding the fire, including whether anyone was threatened with harm by it.

9. The government contends that the district court erred in denying the transfer motion because it improperly applied a glimmer of hope test. This argument is without merit. There is not only no evidence in the record that the dis-

trict court applied a glimmer of hope test, but the record supports the conclusion that defendant has a realistic chance of rehabilitation. Dr. Kushner stated that the chances of recidivism could be substantially reduced, and that defendant would have a reasonable prospect for rehabilitation, after four years of treatment in a residential setting. Moreover, as noted below, the district court properly concluded that defendant had demonstrated some rehabilitative potential.

uncontroverted evidence adduced at the hearing was the [defendant] did not think he could change." This contention is without merit. While defendant was somewhat pessimistic about his ability to change, which Dr. Kushner attributed to the difficult life he has led, this does not suggest that defendant was not amenable to treatment. As heretofore referred to, his attitude when treated at Charter Hospital reflects a desire to improve, evidenced by his wish for treatment of a longer duration than thirty days.

The government also contends, relying on *Nelson,* 68 F.3d at 590–91, that the district court erred by failing to identify any program that would rehabilitate defendant. In *Nelson,* however, the Second Circuit found that the district court's finding regarding the availability of treatment programs was inadequate because there was "no indication that the district court ... made any inquiry into juvenile programs available for someone of Nelson's age." *Nelson,* 68 F.3d at 590. Here, the district clearly inquired into the availability of programs for defendant.

 Furthermore, the Second Circuit stated that a district court is not required to identify a particular program that would accept the juvenile and that the burden of persuasion to show that there were no available programs was on the government. *Id.* at 590–91. It added that

> [f]or the government to carry its burden of persuasion, it must, of course, do more than merely assert the unavailability of an appropriate program. Because this burden is placed on the government, the district court cannot require the defendant to locate his own correctional facility.

*Id.* at 591. Here, the government has done no more than assert the unavailability of an appropriate program, and therefore has not carried its burden of persuasion.

### V.

In summary, we find that the district court, as it was required to do, considered and made findings regarding each of the six factors. These findings are not clearly erroneous. Therefore, the district court's determination that a balancing of the factors weighed in favor of denying transfer is not an abuse of discretion. We AFFIRM. The mandate shall issue forthwith. No petition for rehearing shall be entertained.