**UNITED STATES of AMERICA, Plaintiff**

**v.**

**JUVENILE (I.H., Jr.), Respondent**

Crim. Nos. 1996-86 & 1996-91

District Court of the Virgin Islands

Div. of St. Thomas and St. John

March 31, 1998

AUDREY L. THOMAS-FRANCIS, ESQ., (Ass't United States Attn'y), *for Plaintiff*

W. MARK HILLSMAN, ESQ., (Dudley, Clark & Chan), *for Respondent*

MOORE, *Chief Judge*

## OPINION MEMORANDUM

This matter is before the Court on the motion of the United States to transfer the respondent ["I.H."], a juvenile, for criminal prosecution as an adult.[1]

The Court has jurisdiction in this matter pursuant to Revised Organic Act of 1954 § 22, 48 U.S.C. § 1612, and 18 U.S.C. § 5032. For reasons set forth below, the motion to transfer will be granted.

A similar motion to transfer I.H. to be prosecuted as an adult was granted by the Court after a hearing. Because the required form of the certification that I.H. had no prior juvenile record in this territory was not in the proper form, the Court of Appeals held that this Court lacked jurisdiction to entertain or grant the earlier motion.[2] *Impounded (Juvenile I.H., Jr.)*, 37 V.I. 454, 120 F.3d 457, 460 (3d Cir. 1997). At a status conference after the Court of Appeals remanded the case back to this Court, all parties and the Court agreed a de novo hearing on the motion for transfer was required. On that basis, the Court has not considered evidence from the first hearing in its deliberation on the present motion to transfer, even though there is authority to do so. *See, United States v. Juvenile Male*, 956 F.2d 169, 171 (8th Cir. 1991) (where same judge presides at both hearings, district court had right to incorporate at a subsequent hearing on motion to transfer transcript of prior hearing vacated for lack of jurisdiction despite respondent's objection that transcript was inadmissible hearsay).

## I. Facts

There are two separate criminal actions consolidated for consideration in the motion for transfer. The Court will first lay out the

---

[1] Juvenile delinquency proceedings are subject to limitations regarding public disclosure of the identity of the juvenile defendant and disclosure of information and records related to the juvenile proceedings. 18 U.S.C. § 5038, *see also, United States v. A. D.*, 28 F.3d 1353 (3d Cir. 1994). The documents in this case have thus been filed under seal using the juvenile's initials. Moreover, the evidentiary hearing on the government's motion to transfer was held in a courtroom closed to the general public.

[2] "Any proceedings against a juvenile under this chapter or as an adult shall not be commenced until any prior juvenile court records of such juvenile have been received by the court, or the clerk of the juvenile court has certified in writing that the juvenile has no prior record." 18 U.S.C. § 5032.

relevant facts in each then discuss the testimony given at the hearing on the instant motion.

*A. Crim. No. 1996-86*

On October 18, 1995, at approximately 7:40 p.m., a young male flagged down a husband and wife as they were driving home in the Scott Free area of St. Thomas. The assailant pointed a gun at the wife's head and ordered her to get out of the car. After they dismounted, the same gunman ordered them to get into the back seat of the car. A second male got into the driver's seat; a third got into the front passenger seat. The gunman sat in the back with the two victims.

Investigation led police to an adult suspect, Duncan Connor. Under interrogation he admitted he was the passenger in the front seat of the car and that the gunman was I.H.

After their abduction, the victims were driven up the Scott Free Road to the Four Corners area. Duncan Connor maintained that it was I.H. who told the driver of the car, later identified as another adult, David Thompson, to drive the car to "Naked Island" also known as Little Magens Beach. The female victim corroborated Connor's account that the gunman in the back seat was giving the orders and appeared to her to have been in charge throughout their assault.

At some point during the drive to Little Megans, I.H. became upset that the driver, Thompson, was laughing and driving erratically. I.H. told Thompson to shut up and, when he didn't, I.H. fired a shot through the windshield of the car.

When they arrived at Little Megans, I.H ordered everyone from the car. According to the female victim, I.H. held the gun on her and her husband while Connor and Thompson searched them, removing their possessions. I.H. then ordered everyone to the beach. Connor related that I.H. told the victims that if anyone resisted, "blood woulu be flying."

Once down at the beach, the female victim was separated from her husband, and both were ordered to undress. The female victim told police she was raped twice. On each assault, one of her attackers held her ankles while she was raped. She could not say exactly which of the three attackers raped her. She was then forced

to perform oral sodomy three times. Although, she could not identify exactly which of her three attackers forced her into these acts, Connor related that he saw I.H. force the victim to perform oral sodomy.

I.H. was arrested and charged with: car-jacking [18 U.S.C. § 2119]; possession of a firearm during a crime of violence [18 U.S.C. § 924(c)]; aggravated rape [V.I. CODE ANN. 14, § 1700(c) (1996)]; robbery in the first degree [14 V.I.C. § 1862]; juvenile delinquency [18 U.S.C. § 5031]; and, aiding and abetting [14 V.I.C. § 11].

### B. Crim. No. 1996-91

Less than a month later, at about 5:30 p.m. on November 15, 1995, another husband and wife, owners of the Emerald Lady jewelry store in Charlotte-Amalie, St. Thomas, had closed their business for the day and were in the process of securing the jewelry in the store's vault. They heard a knock on the door and when the owner called out asking who was there, a male voice responded, "It's John." When the owner opened the door, a young male pointed a gun in his face, entered the store and ordered the owner and his wife onto the floor. Another young man, also armed with a handgun, followed seconds later. Neither gunman wore a mask.

The gunmen took a large diamond ring valued at approximately $17,000 from the wife and about $250,000 in jewelry from the store's vault. One of the victims identified I.H. out of a photo array as the gunman who had first entered the jewelry store and ordered them to the ground.

Investigation led police to a confidential informant who related that I.H. had admitted robbing the jewelry store with another man. I.H. is charged in this case with violation of the Hobbs Act [18 U.S.C. § 1951], possession of a firearm during a crime of violence [18 U.S.C. § 924(c)], juvenile delinquency [18 U.S.C. § 5031], robbery in the first degree [14 V.I.C. § 1700 (c)], and assault in the first degree [14 V.I.C. § 295].

### C. Relevant Evidence and Testimony Before the Court

A hearing was held February 19, 20, and 23, 1998, on the government's motion for transfer. The Court will first provide a

brief synopsis of each side's pertinent witness testimony and then a summary of the other information it has considered in deciding this motion.

### 1. Government Witnesses

The government called a number of witnesses familiar with I.H. and his relevant conduct or familiar with programs available to treat youthful offenders charged with similar crimes. The witnesses were: Jeanette Smith, Principal of the Charlotte-Amalie High School ["CAHS"]; Dr. Diane Brinker, a social worker in private practice here; Janet Turnbull-Krigger and Tracey Bouganeau, social workers with the Virgin Islands Department of Human Services; Barbara Madden, special agent of the Federal Bureau of Investigation ["FBI"]; Dr. Rita Dudley-Grant, a psychologist in private practice; Sergeant Curtis Griffin, an officer of the Virgin Islands Police Department; James Horvath, a Court Security Officer of this Court; and Dr. Lenard Lexier, a psychiatrist specializing in working with juvenile offenders.

Jeanette Smith, principal of CAHS, testified regarding I.H.'s time as a student there. I.H. was an average student who was dismissed from school in January, 1996, during his junior year. I.H. had been found in school with a fully loaded .357 magnum pistol. School records introduced through Ms. Smith confirm that I.H. was dismissed because of the gun. These records further show at least one other run in with authority. While a seventh grader, I.H. brought a BB gun to school and, when it was confiscated, stole the gun from the principal's office.

Two other acts of indiscipline bear special mention. In 1993, I.H. assaulted another student by holding a freshly sharpened pencil to her eye. When questioned about his conduct, I.H. refused to express remorse or sorrow. The record reflects that he rather saw this as a joke. Although the incident was brought to the attention of his parents, no other action was taken by school officials. In 1995, I.H. received a five-day suspension from school for having broken into a teacher's closet to remove copies of a test.

Dr. Brinker was next to testify and did so based upon her professional familiarity with treatment programs for both juvenile and adult sex offenders here in the Virgin Islands. Though a

trained, professional social worker, she had not interviewed I.H. personally. Dr. Brinker stated that there are no facilities in the Virgin Islands where juvenile sex offenders may be treated. Further, based upon her own experience working with adult sex offenders, she testified that extended treatment is required in these cases. Indeed, in her opinion, sex offenders are never cured and require continued treatment and therapy, oftentimes for the rest of their lives.

Janet Turnbull-Krigger, a supervising social worker with the Virgin Islands Department of Human Services, testified next. She detailed treatment programs available to juveniles through her department. Considering the fact that I.H. is now nineteen years of age, there appears little her department can now provide. According to her testimony, her department loses jurisdiction over adjudicated juvenile delinquents at the age of eighteen. She did participate in one interview of I.H. in April, 1996. On that basis, and in consultation with members of her staff, she recommended that I.H. be continued in juvenile status for treatment rather than prosecuted as an adult primarily, she said, because of his age. She affirmed I.H. will require a structured environment of treatment and counseling of from three to five years.

On cross examination it was revealed that Ms. Turnbull-Krigger knew little of I.H.'s conduct after the carjacking and rape. She was unaware that he was also accused of the jewelry store robbery. While she did recommend that he be adjudicated as a juvenile and not as an adult, she said she would have to reconsider that recommendation if the facts of the jewelry store robbery were presented to her.

· Tracey Bouganeau, a social worker under Ms. Turnbull-Krigger's supervision, testified next. She made some observations on the case at hand based upon participation in interviews with I.H. According to Ms. Bouganeau, I.H. would need two to three years of intensive counseling and therapy to overcome his apparent predilections. But she also indicated that treatment plans are individualized and revised throughout treatment in accordance with the subject's response. In the final analysis, Ms. Bouganeau recommended I.H. be adjudicated as a juvenile.

FBI Special Agent Madden's testimony consisted of a recap of her activities during the investigation of the carjacking and rape

I.H. is accused of having committed, including an interview with I.H. on March 15, 1996. I.H. told Agent Madden that he had thrown away two handguns, a 9 millimeter and a .22 caliber. I.H. said he had placed the guns in a garbage bag and thrown them into a dumpster. I.H.'s weapon of choice was a .380 made by Larsen. He liked a .380 because it was small and easy to conceal but still an effective weapon that would "get the job done."

Dr. Dudley-Grant next took the stand, testifying from her own professional expertise and two sessions with I.H. She detailed available treatment regimes for those juveniles who, like I.H., are charged with serious violent felonies and sex crimes. Dr. Dudley-Grant confirmed earlier testimony that no programs exist for such juvenile delinquents here in the Virgin Islands. She was very clear, however, that such programs do exist and that it is her impression the federal Bureau of Prisons ["BOP"] maintains contracts with these programs for placement of juveniles adjudicated as delinquent in federal proceedings.

Based upon the interviews and tests she gave I.H., Dr. Dudley-Grant described him as an extremely serious young man who seemed conscious he was under close observation and concerned about how he was portraying himself. She described I.H.'s personality functioning as controlled. I.H. was something of a "late bloomer" sexually and seemed rather naive about the opposite sex. He is, however, a young man of average judgment and intelligence. Dr. Dudley-Grant was also surprised when she learned of the details of the charges against I.H., remarking that such conduct was not consistent with her evaluation of him. Instead, she allowed that such conduct was more consistent with a sociopathic personality.

Dr. Dudley-Grant unhesitatingly and steadfastly recommended that I.H. be adjudicated as a juvenile. She recommended a long-term treatment regime beginning with isolation from society and aggressive behavior modification therapy strongly connecting to his self-interest. Her recommendations were deeply impeached during examination by government counsel. Dr. Dudley-Grant conceded her belief that no one who commits a crime while still a juvenile should under any circumstances be prosecuted as an adult.

Next on for the government came Detective Sergeant Curtis Griffin, who testified about his investigation of the crimes charged here and contact he had with I.H. Sergeant Griffin gave an account of the jewelry store robbery based largely on interviews of I.H.'s accomplice. The accomplice related that the robbery had been I.H.'s idea and that I.H. had, in fact, been the first of the bandits to enter the store.

During mid-March 1996 interviews of I.H. after the robbery, I.H. told Sergeant Griffin that he had many weapons, including a 9 millimeter pistol, a .357 revolver and a .380 automatic. When asked where they were, I.H. responded that he had thrown them in a dumpster. He also told Sergeant Griffin that a revolver was his weapon of choice, because it did not leave incriminating evidence behind by ejecting shell casings.

Sergeant Griffin testified I.H. affirmed that he knew the difference between right and wrong, but that he saw nothing wrong with robbery. In substance, I.H.'s view of this crime was that the rich got their wealth by robbing others and that robbery itself is hard work requiring planning and risk of injury during the crime as well as during the escape.

I.H. promised Sergeant Griffin that he would tell all he knew if he were permitted to speak to a female acquaintance.[3] Sergeant Griffin undertook efforts to satisfy that request and made contact with the girl. She gave him a copy of a letter dated March 13, 1996, from I.H. to her, portions of which help illuminate the present inquiry.

The letter was an apparent attempt by I.H. to arrange a face-to-face conversation with the young lady and to impress her with his impending prosecution. Among other things I.H. wrote that his life seemed to be falling apart and that he was "really in for a not so happy ending." I.H. admonished the recipient not to reveal the content of the letter, as "it [might] serve as something against me." Tellingly, he went on to add:

> You can laugh if you want but out of all your boyfriends, friends, family members, associates I know I am the most

---

[3] The young lady's name was given at the hearing. However, it is the impression of the Court she may yet be a juvenile. For that reason her name will not appear in this opinion.

wanted, ruthless, cut throat, hard back that you have ever
meet [sic] despite my looks, attitude and the way I speak
to people.

Ultimately, I.H. admitted to Griffin that he wrote the letter and that
he attached no particular significance to any of its contents.

Court Security Officer James Horvath came on to testify next on
behalf of the government. His testimony is recounted in detail
below. See, pp. 404 — 405, *infra.*

Last of the government's witnesses was Leonard Lexier, M.D. Dr.
Lexier is medical director of Virgin Islands Behavioral Services and
a psychiatrist with extensive experience treating juvenile delin-
quents. He testified from his training and experience, as well as
upon his evaluation of I.H. in preparation for testimony at the
transfer hearing.

On the basis of a battery of psychologic tests, Dr. Lexier
concluded that I.H. is of average to a bit above average intelligence
and has no signs of mental retardation. Further, I.H. demonstrated
the kind of psychological maturity appropriate to one of his age.
Dr. Lexier went on to add, however, that I.H. is lacking in social
judgment.

Dr. Lexier found no evidence that I.H. is suffering from any
psychoses or mental defect of any kind. When pressed, he did say
that, if the allegations against I.H. are true, this would indicate the
respondent was a highly developed sociopath. Dr. Lexier said that
he would be shocked if the accusations were true as I.H. did not
present himself as one with the capacity to do such acts. While Dr.
Lexier conceded that he might amend his diagnosis if he knew that
the defendant had a history of use of weapons, he basically did not
vary his opinion that I.H. is not a sociopath. On the question of
whether I.H. has the kind of intellect that would permit him to
manipulate the tests, Dr. Lexier responded that it was a very
remote possibility. Dr. Lexier pointed to other test results and I.H.'s
school grades as indicating that he lacks the kind of superior
intellect required to manipulate the psychological tests. Dr. Lexier
opined that I.H. has the kind of personality which leads him
inwardly to question his own significance and to attempt to
magnify his stature to others. When asked bluntly whether I.H. has

the mental capacity and social development to be successfully rehabilitated, Dr. Lexier answered in the affirmative.

A list of BOP contract facilities for treatment of juveniles together with a synopsis of their treatment methodologies was shown to the witness. Two were called to his attention. The first was the Lake Region Law Enforcement Center. The second was the Shelby Training Center. Both these facilities are site secure, a precaution Dr. Lexier affirmatively recommended for the treatment of I.H. Dr. Lexier was very candid in his evaluation of these institutions.

From his experience and expertise Dr. Lexier believes that empathy with the victim is a key element to successful treatment of the sex offender I.H. is presumed to be for purposes of these proceedings. Dr. Lexier found no evidence that either the Shelby Training Center or Lake Region facility included the initial elements of victim empathy in their treatment regimes. Dr. Lexier disdainfully compared the methodology of the Shelby Training Center with that of an "alcoholics anonymous" approach to the treatment of juvenile sex offenders. The approach in use at the Lake Region institution fared somewhat better as being "minimally appropriate."

Based upon his interviews and evaluation of I.H., Dr. Lexier felt that the juvenile would be a good candidate for rehabilitation. He remarked that I.H.'s genesis in an apparently loving family did not necessarily indicate he would be successful in rehabilitation. Dr. Lexier went on to say however that I.H. might rightly feel that he had let his family down and that this could motivate him to successfully complete treatment.

Dr. Lexier allowed that the average time required for rehabilitation was about two years, but that a highly motivated individual might be successfully treated in as little as sixteen months. When asked by I.H.'s counsel if five years would be sufficient to rehabilitate someone such as the respondent, Dr. Lexier replied that it absolutely would be.[4] Dr. Lexier accordingly recommended that I.H. be adjudicated as a juvenile because he could be treated

---

[4] Under applicable federal law, Juveniles who at the time of adjudication are between the age of 18 and 21 years old, may be retained in detention for up to five years if their adjudication is based upon an A, B, or C felony. 18 U.S.C. § 5037(c)(2)(A). Since the respondent is now 19 years old and stands to be adjudicated on charges of rape and

and rehabilitated as a juvenile. Dr. Lexier felt that I.H. would have no chance for a productive life if sent to prison as an adult. In response to a question from the Court, Dr. Lexier acknowledged that it was his impression that no adequate treatment program would be available to I.H. if he were prosecuted as an adult and sentenced to prison, and that this was a factor in his recommendation.

2. Respondent's Witnesses

The juvenile also called witnesses. I.H.'s aunt, his godmother, and his father all testified on his behalf at the hearing.

His aunt's and his godmother's testimony were quite similar. Both described I.H. as coming from a very loving family and stable home environment. Both testified they had known I.H. since his birth and that they both maintained close contact with him throughout his youth. His aunt served as his Boy Scout assistant troop leader. His godmother helped see to his spiritual welfare through organized activities at church, testified that I.H. seemed to do well there, and told of how he was often selected for special readings or other church activities. Both his aunt and his godmother maintained that they continue to love I.H. very much and would work with his parents to ensure his rehabilitation if given the chance.

I.H.'s father bore witness that his was a loving household. I.H. has a younger brother and his father testified that both he and his wife have participated in rearing and disciplining their children. He spoke of a very close relationship with his son and that he was as involved in his upbringing as any son could hope for. The father described how he monitored his son's performance in school, took his son to church and to Little League baseball, participated in his promotion ceremonies as a Boy Scout and kept involved with his son's participation in the steel band sponsored by his church. He also testified that he was involved with his son's hobby, which appears to have been aviation.

The respondent's father testified that I.H. had been particularly fond of his grandmother who died when I.H. was five years old.

armed robbery, the Court could, upon such an adjudication, retain I.H. in detention until he is approximately 26 years old.

I.H. was deeply affected and set his bed afire in an effort to, as his father said, "be with his grandmother." His father took the juvenile to counseling following this episode and, after three or four sessions, his son was able to deal with his feelings over his grandmother's death. This kind of conduct was never repeated, according to the father.

On cross-examination, the father testified that he had once bought his son a BB gun and that his son occasionally shot birds with it. He confirmed earlier evidence that his son once brought the BB gun to school, and had been disciplined for it. Following the incident, I.H.'s father took the BB gun away from his son. He never told his wife of this. Other than the BB gun, the father testified he never saw I.H. with a weapon of any kind.

Lastly, I.H.'s father testified that, despite the charges against him, he still loves his son very much. No one hearing his father's testimony could question that fact.

3. Other Matters Before the Court

The Court has also examined I.H.'s case file, which revealed several serious violations of his conditions of release. On September 30, 1997, and again on October 2, 1997, a female identifying herself as I.H.'s mother called the U.S. Probation Office in St. Thomas in an apparent attempt to secure permission for I.H. to temporarily leave his home. Subsequent investigation revealed that the caller was not his mother.

More seriously, on January 14, 1998, I.H. attempted to enter the courthouse with a knife secreted inside the waistband of his trousers. He was on his way to a scheduled meeting with his probation officer. When he passed through the metal detector, it alerted. Court Security Officer Horvath used a hand-held detector to isolate the source of the alarm and found the clasp knife with a four inch serrated blade. Officer Horvath confiscated the weapon, told I.H. to report the incident to his probation officer, and to ask the officer to come downstairs to consult with Officer Horvath. To make matters worse, I.H. did not tell his probation officer about the incident. Only later, after I.H. had departed the probation office, did Officer Horvath and the probation officer speak and the probation officer learned of I.H.'s misadventure. When I.H. was

404

confronted by his probation officer during a subsequent phone conversation, he admitted possession of the knife.[5]

Information such as this is unquestionably relevant to the Court's deliberation whether or not to transfer a juvenile for prosecution as an adult, even though the conduct took place well after that which is the subject of the motion for transfer. In a 1988 case, a district court found that conduct occurring while a juvenile was pending transfer was relevant to the decision to transfer the juvenile for prosecution as an adult. *In re J. Anthony G.*, 690 F. Supp. 760 (S.D. Ind. 1988). There, the juvenile repeatedly cut school, refused to contact his probation officer as ordered by the court, and failed or skipped mandatory drug tests. *Id.* at 764. While acknowledging that the conditions of release were hardly a sophisticated program of treatment, the district judge nevertheless considered the juvenile's failure to comply with those conditions as relevant on the question of whether the juvenile was responsive to treatment efforts. *Id.* at 765.

■ As in *J. Anthony G.*, the conditions imposed for I.H.'s release into the general public are not a sophisticated regimen of treatment. His inability to comply with these conditions, however, can give some measure of the likelihood I.H. will respond positively to leniency and rehabilitative treatment as a juvenile. The Court accordingly will take into consideration I.H.'s inability or unwillingness to comply with his conditions of release in deciding this motion.

## II. Analysis of Law and Fact

Treatment of juveniles in federal court is governed by the Federal Juvenile Justice and Delinquency Prevention Act ["the Act"].[6] 18 U.S.C. §§ 5031 — 5042. The purpose of the Act is to "remove juveniles from the ordinary criminal process in order to

---

[5] A hearing on I.H.'s violation of conditions of release was held before the magistrate judge on February 23, 1998. The magistrate judge did not order I.H. placed in confinement but admonished him about his duty to fully and completely comply with the conditions of his release.

[6] Under the Act, a "juvenile is a person who has not attained his [or her] eighteenth birthday, or for the purpose of proceedings and disposition under [the Act] for an alleged act of juvenile delinquency, a person who has not attained his [or her] twenty-first birthday . . . ." 18 U.S.C. § 5031. Though I.H. is now 19 years of age, he is thus still considered

avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." *United States v. Doe*, 94 F.3d 532, 536 (9th Cir. 1996) *quoting United States v. Brian N.*, 900 F.2d 218, 220 (10th Cir. 1990). The Act's purpose, however, must be weighed against "the need to protect the public from 'violent and dangerous individuals and provide sanctions for anti-social acts.'" *Doe*, 94 F.3d at 536, *quoting United States v. Alexander*, 695 F.2d 398, 401 (9th Cir. 1982).

In cases involving juveniles who, like I.H., are over the age of 13 at the time of their alleged delinquency and who are charged with committing violent felonies involving firearms, the government may seek to proceed against them as an adult. 18 U.S.C. § 5032. Where such transfer would be in the interests of justice, a reviewing court may order the juvenile transferred and tried as an adult. *Id.*

There are two jurisdictional prerequisites to a transfer proceeding. First, there must be on file a certification by the Attorney General or her designee that, on the facts of the instant case, the offenses charged are crimes of violence and that there is a substantial federal interest in the case or offense. *Id.* Both counsel stipulated that the required certification was on file in both these cases.[7] The Court has examined the certification and finds it to be in proper form.

The second prerequisite is that the court must have before it either the defendant's prior juvenile court record or, in the alternative, a written certification by the clerk of the juvenile court that the juvenile has no prior record or that the record is unavailable. 18 U.S.C. § 5032; *see also, Impounded (Juvenile I.H., Jr.)*, 120 F.3d at 460 (district court lacks jurisdiction to begin transfer proceeding unless record certification requirement is met). It was stipulated by both counsel that the required record certification is properly before the

---

a juvenile. Juvenile delinquency "is the violation of a law of the United States committed by a person prior to his [or her] eighteenth birthday . . . ." *Id.*

[7] Defense counsel had objected to the certification on the basis that it states only that a federal interest is present without specifying exactly that interest, apparently in reliance upon *United States v. Juvenile Male # 1*, 86 F.3d 1314 (4th Cir. 1996). Counsel's objection was later withdrawn on the record in the face of binding precedent that such a certification lies beyond the scope of judicial review. *See, Impounded (Juvenile R.G.)*, 37 V.I. 363, 117 F.3d 730, 736 (3d Cir. 1997).

Court in the instant case. The Court has examined the record certification and finds it to be in proper form according to the Act.

■ In reaching its decision on transfer once jurisdiction is established, the court is obliged to make findings on the record in accordance with specific factors set out in the statute. *United States v. A.R.*, 38 F.3d 699, 705 (3d Cir. 1994) These are: (1) the age and social background of the juvenile; (2) the nature of the alleged offense; (3) the extent and nature of the juvenile's prior delinquency record; (4) the juvenile's present intellectual development and psychological maturity; (5) the nature of past treatment efforts and the juvenile's response to such efforts; and, (6) the availability of programs designed to treat the juvenile's behavioral problems. 18 U.S.C. § 5032 In considering the nature of the offense, the court must consider the degree to which the juvenile played a leadership role and a finding that he or she did so weighs in favor of transfer. *Id.*

■ For purposes of the transfer hearing, a court may assume the juvenile committed the alleged offenses.[8] *A. R.*, 38 F.3d at 703; *accord, United States v. Nelson*, 68 F.3d 583, 588 (2d Cir. 1995); *United States v. One Juvenile Male*, 40 F.3d 841, 845 (6th Cir. 1994); *In Re Sealed Case*, 282 U.S. App. D.C. 156, 893 F.2d 363, 369 (D.C. Cir. 1990); and, *United States v. Doe*, 871 F.2d 1248, 1250 n. 1 (5th Cir. 1989). The reviewing trial court is not to examine the sufficiency of the government's evidence in that regard. *Nelson*, 68 F.3d at 589. While the government bears the entire burden of rebutting the statutory presumption against transfer, the government need only persuade the court by a preponderance of the evidence. *A.R.*, 38 F.3d at 703.

■ A motion to transfer is properly granted where the judge weighs the statutory factors and concludes that the risk of harm to society posed by affording the juvenile more lenient treatment of the juvenile justice system outweighs the juvenile's chance for rehabilitation. *United States v. T.F.F.*, 55 F.3d 1118, 1121 (6th Cir.

---

[8] On that basis the Court will speak of I.H.'s alleged criminal conduct as though he has, in fact, committed the crimes charged. No one should apprehend from that fact, however, that the Court has concluded the juvenile in this case is indeed guilty.

1995) *citing One Juvenile Male,* 40 F.3d at 844 (under the Act motion to transfer juvenile for adult prosecution is properly granted where district court determines that risk of harm to society posed by affording respondent more lenient treatment within juvenile justice system outweighs respondent's chance for rehabilitation); *accord, United States v. Juvenile K.J.C.,* 976 F. Supp. 1219, 1222 (N.D. Iowa 1997); and, *United States v. Jerry Paul C.,* 929 F. Supp. 1406, 1411 (D.N.M. 1996). The Court will first enter its findings on each of the statutory factors *in seratim* and then explain how each factor weighs in the Court's calculus on the motion for transfer.

*A. Findings on the Section 5032 Factors*

1. Age and Social Background

The Court finds that I.H.'s birthday is November 6, 1978. I.H. was then within less than a month of his 17th birthday when he committed the offenses charged in Crim. No. 1996-86 and was 17 years old when he committed the crimes charged in Crim. No. 1996-91. He is now 19 years old.

The Court finds that I.H. comes from a stable, loving family background. Indeed, I.H. seems to enjoy an extended family relationship and it appears to the Court that the adults he came in contact with nurtured him and tried to make sure he stayed on the straight and narrow. It further appears to the Court he has rejected that upbringing.

■ I.H. was only 13 months from his 18th birthday at the time he began the crime spree alleged here. He is now 19 years old. A court considering transfer must take the juvenile's age at the time of transfer, as well as his or her age at the time of the offense, into consideration. *Nelson,* 68 F.3d at 589 (district court errs when it refuses to consider juvenile's age at the time of transfer proceeding). Unless there is some indication of improper delay by the government in bringing the charges, there is every reason to give weight to the juvenile's age at the time of transfer in considering the motion. *Id.* Here, there is not a scintilla of a suggestion the government has delayed or that what delay there has been was improper.

■ The Court finds that I.H.'s age at the time of the offenses and at the time of transfer auger in favor of transferring him for prosecution as an adult. It must also be considered that his having come from a stable home and yet having done these terrible acts likewise weigh in favor of transfer.

2. Nature of the Alleged Offenses

The brutal nature of the carjacking charged in Crim. No. 1996-86 is beyond question. A young couple was first kidnaped, then robbed at gunpoint. At some point, I.H. demonstrated for the two his willingness to employ the gun by firing a shot through the windshield to control one of his accomplices. When they were walked to the beach, just before the sexual assault, the victims were told that if they resisted, "blood would fly." The wife was raped and forced to perform oral sex on her tormentors. Both victims were then left naked on a deserted beach in the middle of the night. I.H.'s accomplices in this assault both were adults, a fact which must be taken into consideration. The robbery charged in Crim. No. 1996-91 was also potentially deadly. Both I.H. and his accomplice used guns to threaten the owners of the jewelry store unless they cooperated.

Further, I.H. was clearly the leader in both these crimes. Duncan Connor and the female victim of the carjacking established that I.H. held the gun and sat in the back seat with the victims while giving directions to the driver. The Emerald Lady Jewelry Store was robbed in execution of I.H.'s plan. He carried out the subterfuge which gained the robber's entry to the store and he was the first of the two bandits through the door.

Both crimes were well thought out by I.H. and executed at his direction. From the outset of the carjacking, I.H. was in control. Upon commandeering the vehicle, I.H. told David Thompson exactly where he wanted him to go, which was a location ideally suited to I.H.'s criminal enterprise. The jewelry store robbery was also well planned and executed. I.H. approached the store after it had closed for the evening, but before the jewelry had been safely locked in the vault. He used subterfuge to gain entry and then overpowered any resistance with an overwhelming show of force.

■ The finding that I.H. played a leadership role in the offenses weighs in favor of transferring I.H. for prosecution as an adult and, indeed, this factor taken as a whole weighs strongly in favor of his transfer to adult prosecution.

3. Extent and Nature of Prior Delinquency Record

■ I.H. has no delinquency record. There is no indication he has ever been arrested for anything other than the offenses charged here. This factor weighs against transferring I.H. for prosecution as an adult.

4. Present Intellectual Development and Psychological Maturity

I.H. exhibits the maturity and psychological development appropriate for his age, although Dr. Dudley-Grant did opine that I.H. is somewhat naive in the matter of the opposite sex. His academic progress seems to have been about average for his age, leaving his disciplinary record aside. I.H. told Sergeant Griffin he knew right from wrong, which is supported by the testimony of Drs. Dudley-Grant and Lexier that he has no identifiable mental diseases or defects.

It could be said that his normal intellectual and psychological status could make I.H. a good candidate for rehabilitation. On the other hand, it could just as readily be argued that I.H. had the intellectual and psychological tools to have known better than to have instigated and lead the perpetration of the crimes he is presumed here to have committed.

■ The psychological testimony suggests that I.H. may suffer some feelings of inferiority and that his leadership of these crimes could be an attempt to build himself up in his own eyes and those of his peers. Portions of the text of the letter he wrote to his female acquaintance would seem to corroborate this view. Psychological counseling and therapy might help him put such matters into their proper perspective, though nothing suggests that such psychological services would not be as readily available to an adult as to a juvenile. On balance, however, this factor seems to weigh somewhat in favor of adjudicating I.H. as a juvenile.

410

### 5. The Nature of Past Treatment Efforts and Response

 Although there has been no formal effort to treat I.H. in the context of the juvenile justice system, he seems to have responded well to the counseling received to help him deal with his grandmother's death when he was only five years old. Counterbalancing and outweighing this is I.H.'s unwillingness and inability to comply with the conditions of his pre-trial release. I.H. has already been shown considerable leniency in being allowed to remain with his parents under house confinement. His response to this lenient treatment, especially bringing a concealed weapon into the courthouse during a visit for regular consultation with his probation officer, may well predict his inability or unwillingness to respond positively to the treatment available to juveniles. Accordingly, this factor is at best neutral or weighs slightly in favor of transferring I.H. for prosecution as an adult.

### 6. Availability of Programs for Treatment

There were a number of exhibits entered establishing that the Bureau of Prisons maintains contracts with facilities offering treatment programs aimed at rehabilitation of youthful offenders. Two in specific meet the criteria for a secure facility with a sex offender treatment program recommended by the experts. These are the Lake Region facility and the Shelby Training Center, although the adequacy of their treatment regimes was put in doubt by Dr. Lexier's testimony. He all but scoffed at the treatment methodology employed at Shelby Training Center, and he labeled that at the Lake Region facility as being only "minimally adequate."

 Given these doubts about the potential efficacy of these programs available to treat I.H. if he were retained as a juvenile, the Court finds this factor weighs only slightly against transferring I.H. for prosecution as an adult.

### B. The Collective Weight of the Section 5032 Factors

Upon balancing the six statutory factors, the Court concludes that the interests of justice warrant transferring I.H. for adult prosecution. Particular weight has been given to the first two

411

factors: his age and the nature of the offenses, including I.H.'s leadership role in both of them.

First, I.H. has already reached his 19th birthday. He chose to associate with adults in perpetrating the carjacking and rape alleged in Crim. No. 1996-86. His age and this particular pattern of criminal conduct then strongly auger in favor of proceeding against him as an adult. Indeed, he already regards and portrays himself as a hardened criminal. In urging his young female acquaintance to get in touch with him, the respondent wrote that, despite his outward appearance and attitude, he was a most wanted and ruthless cutthroat.

By itself, this could be considered just the puffing of an adolescent to get the attention of a girl. Together with his response to his conditions of release, this self-characterization leads the Court to concluded that, at his age, there is very little prospect that he will turn back toward behavior more in keeping with that expected of a productive citizen if he is accorded the more lenient treatment given to juveniles. In a very real sense, he has already affirmatively rejected that path.

Second, the savagery and degree of violence of the crimes I.H. is assumed to have committed is shocking. Not content simply to rob a young couple at gunpoint, he further shattered their lives by participating in the brutal violation of the wife while the husband was only some few feet away, powerless to spare her from such torture. Less than thirty days later, I.H. instigated an armed robbery where two persons were again threatened with death unless they cooperated with his criminal plan. Most telling, though, is the leadership role I.H. played in both these offenses.

While it could be argued that all other factors weigh in favor of adjudicating I.H. as a juvenile, that would be charitable advocacy at best. True, his lack of prior juvenile record, intellectual and psychological development, as well as the availability of treatment programs for juvenile sex offenders do weigh in his favor. But his response to treatment efforts as measured by his unwillingness to faithfully comply with the conditions of his pretrial release is at best a neutral factor. Then, too, there is the substantial doubt cast upon the credibility of the treatment regimes at the two facilities suitable to receive a delinquent of I.H.'s character which were raised by Dr. Lexier's testimony.

412

■ Equal weight need not be accorded each of the statutory factors. In its good discretion, the Court can give more weight to one factor over the others and is well within the law to accord the nature of and the juvenile's leadership role in the offense greater weight than the other factors. A.R., 38 F.3d at 705 (citation omitted); *accord, United States v. Juvenile No. 1*, 118 F.3d 298, 307 (5th Cir. 1997); *Doe*, 94 F.3d at 537; *Nelson*, 68 F.3d at 590; *One Juvenile Male*, 40 F.3d at 846; and, *United States v. Hemmer*, 729 F.2d 10, 17 (1st Cir 1984).

In *A.R.*, a 17 year-old juvenile was arrested after carjacking an automobile at gunpoint. A.R., 38 F.3d at 699. The government sought and secured his transfer for prosecution as an adult. On appeal, A.R. challenged the fact that the district court had given more weight to the nature of the offense factor than others mandated by the Act. *Id.* at 705. The Court of Appeals held that, so long as the trial judge makes specific findings on each of the statutory factors and explains how each weighs in the transfer decision, it may give more weight to one factor over the others and generally may weigh the factors as it deems appropriate. *Id.*

Here, the facts in Crim. No. 1996-86 are strikingly similar to that in A.R. Just as in that case, I.H. is accused of having committed a carjacking at gunpoint. That I.H. added in the crimes of robbery and rape during the carjacking and then went on to commit another armed robbery within the month are mere sauce for the goose.

On the facts and the law before it, the Court would be justified in finding that I.H. should be prosecuted as an adult purely upon weighing the nature of his offenses, including his leadership role in them, against the other five factors, even assuming all five weighed strongly in favor of his adjudication as a juvenile, which they most certainly do not.

## III. Conclusion

Respondent's counsel in his closing statement reminded that cases such as this are tragic dramas. That, no one could deny. Not only are the facts tragic for I.H.'s victims and family, they are tragic for society as well. This was a young man with some promise. His decision not to develop this promise into becoming a productive and valuable member of our society is evident on the record.

413

The interests of justice in this case mandate that society be permitted to seek the greater protection from I.H.'s predatory urges which follow from his prosecution as an adult. An appropriate order shall issue.

ENTERED this 31st day of March, 1998.

## ORDER

For the reasons set forth in the accompanying memorandum and in accordance with 18 U.S.C. § 5032, it is hereby

ORDERED that the motion of the United States to transfer the respondent for criminal prosecution as an adult be and the same is hereby GRANTED. And it is further

ORDERED that records of this case shall remain sealed pending further order of this Court.

ENTERED this 31st day of March, 1998.