**UNITED STATES of America,
Plaintiff,**

v.

**A.F.F., Juvenile, Defendant.**

**No. 00–CR–20048.**

United States District Court,
E.D. Michigan,
Northern Division.

March 27, 2001.

**REDACTED OPINION AND ORDER DENYING GOVERNMENT'S MOTION TO TRANSFER PROCEEDINGS TO ADULT CRIMINAL PROSECUTION** [1]

LAWSON, District Judge.

A.F.F., a juvenile, is charged with first-degree murder in the death of an infant who was left in his care. The infant was ten weeks old at the time of her death which occurred on September 8, 2000. A.F.F. was seventeen years old at the time of the homicide, two months short of his eighteenth birthday. The killing took place on the Saginaw Chippewa Reservation, within "Indian country" as defined by 18 U.S.C. § 1151.

The United States Attorney for the Eastern District of Michigan has made certification pursuant to 18 U.S.C. § 5032 to proceed against A.F.F. in this Court. The government thereafter filed a motion to transfer A.F.F. from juvenile to adult status. A hearing was conducted on the government's motion on October 12, 2000 at which time counsel for the defendant requested a continuance for additional time to prepare and to obtain a psychological evaluation of the defendant. The government consented to the request and the Court continued the hearing to December 21, 2000, at which time the Court heard testimony from nine witnesses and received eleven exhibits.

The parties requested leave to file post-hearing briefs, which were subsequently received and reviewed by the Court. The parties then returned to court to present argument on the motion on January 19, 2001. Thereafter, the Court requested the transcript of the proceedings, which was received on March 13, 2001. The Court now has before it all items necessary to decide the motion to transfer. Because the Court finds that the government has not overcome the statutory presumption favoring treatment of the defendant as a juvenile, and has not established that the transfer would be in the interest of justice, the Court will deny the motion to transfer.

I.

Ms. H. is a member of the Little River Band of Ottawa Indians. Her daughter was born on June 26, 2000. The defendant, A.F.F., was Ms. H.'s boyfriend that summer but he was not the father of the child. In July 2000, Ms. H. and her daughter moved in to live with A.F.F. and his father in a trailer home located on the Saginaw Chippewa Reservation. Ms. H. had known the defendant for approximately one year at that time.

Ms. H. testified that the baby was generally healthy when they moved in with the defendant and his father. Shortly afterward, however, Ms. H. noted bruises on the baby's back, wrist, fingers and hands after she asked the defendant to put the baby's scratch gloves on following a bath. On another occasion, the defendant took the baby to the hospital because the baby was reported to be coughing up blood. Ms. H. had been at school and learned of the incident when she returned home.

On September 8, 2000, Ms. H. went to school and left the baby in the defendant's care. That afternoon the defendant came to her school to tell her that something was seriously wrong with the baby and that Ms. H. should come immediately with him to the hospital. When she and the defendant arrived at the hospital together, the defendant started crying and repeatedly told her that "it was an accident." The

---

1. This redacted opinion and order is unsealed and should be docketed. The original opinion and order was dated March 27, 2001.

baby was pronounced dead that afternoon as a result of traumatic injuries.

The defendant was interviewed by an FBI agent at the Saginaw Chippewa Tribal Police Station on September 12, 2000. He was not in custody at that time and both of his parents were present at the police station but did not attend the interview. The defendant recanted a prior story he had given to the tribal police that the baby's injuries were accidentally caused, and he admitted to intentionally dropping the baby several times. The defendant expressed remorse, started crying, and talked about suicide.

The defendant was arrested and a criminal complaint was filed on September 15, 2000 charging the defendant was first-degree murder committed within Indian country contrary to 18 U.S.C. §§ 1111 and 1152. On September 18, 2000, a Juvenile Information was filed and the complaint was dismissed. The government filed its transfer motion on September 22, 2000.

## II.

### A.

The Court has jurisdiction over this case by virtue of 18 U.S.C. § 1152 which states in part that "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States ... shall extend to the Indian country." The Saginaw Chippewa Reservation in Isabella County, Michigan constitutes "Indian country" as defined by 18 U.S.C. § 1151.

The Attorney General, through the United States Attorney for the Eastern District of Michigan, has certified that there is a substantial federal interest in this case, a further prerequisite to the Court exercising jurisdiction over a juvenile pursuant to 18 U.S.C. § 5032. A "juvenile" is a person who was less than eighteen years old at the time of an offense, or less than twenty-one years old at the time of the proceedings and disposition under 18 U.S.C. Chapt. 403. 18 U.S.C. § 5031. A.F.F. meets both of these requirements.

The government sought discretionary transfer under a provision within 18 U.S.C. § 5032 which allows for filing a transfer motion if a person over thirteen years old is alleged to have violated, *inter alia*, 18 U.S.C. § 1111, the first-degree murder statute. These facts exist in this case as well and are undisputed.

### B.

The Juvenile Justice and Delinquency Prevention Act (JJDPA), codified at 18 U.S.C. §§ 5031–5042, became law on September 7, 1974, and amended the Federal Juvenile Delinquency Act (FJDA) which had remained essentially unchanged since Congress enacted it in 1938. *See United States v. Juvenile K.J.C.*, 976 F.Supp. 1219, 1221 (N.D.Iowa 1997). Congress amended the JJDPA in 1984 [2] and 1994,[3] but the ultimate aim of the Act remains the same: to rehabilitate juveniles, not to punish them. S.Rep. No. 1011, 93d Cong., 2d Sess., at 22 (1974), reprinted in 1974 U.S.C.C.A.N. 5283, 5286.

In *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), Justice White outlined the basic differ-

---

**2.** In the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, tit. II, 99 Stat. 1837 (1984), Congress expanded the number of offenses for which certain juveniles could be tried as adults. 18 U.S.C. § 5032.

**3.** The Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796 (1994), authorized prosecution as adults of juveniles at age thirteen for certain violent crimes.

ences which distinguish adult and juvenile adjudication of criminal conduct:

> The criminal law proceeds on the theory that defendants have a will and are responsible for their actions. A finding of guilt establishes that they have chosen to engage in conduct so reprehensible and injurious to others that they must be punished to deter them and others from crime. Guilty defendants are considered blame-worthy; they are branded and treated as such, however much the State also pursues rehabilitative ends in the criminal justice system.

> For the most part, the juvenile justice system rests on more deterministic assumptions. Reprehensible acts by juveniles are not deemed the consequence of mature and benevolent choice but of environmental pressures (or lack of them) or of other forces beyond their control. Hence the state legislative judgment not to stigmatize the juvenile delinquent by branding him a criminal; his conduct is not deemed so blameworthy that punishment is required to deter him or others. Coercive measures, where employed, are considered neither retribution nor punishment. Supervision or confinement is aimed at rehabilitation, not at convincing the juvenile of his error simply by imposing pains and penalties. Nor is the purpose to make the juvenile delinquent an object lesson for others, whatever his own merits or demerits may be.

*Id.* at 551–52, 91 S.Ct. 1976 (White, J. concurring).

■ Under the FJDA in its present form, when a juvenile commits certain felonies at age thirteen or older, he may be prosecuted as an adult in the federal district court if proceeding in that manner would be "in the interest of justice." 18 U.S.C. § 5032. When the government files a motion to transfer a juvenile to adult status, the court must balance the purpose of the FJDA—"to remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation," *United States v. One Juvenile Male,* 40 F.3d 841, 844 (6th Cir. 1994) (internal quotes and citations omitted)—against "the need to protect the public from violent offenders." *Id. See also United States v. T.F.F.,* 55 F.3d 1118, 1119 (6th Cir.1995). The district court must "determine [whether] the risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system [is] outweigh[ed by] the defendant's chance for rehabilitation." *One Juvenile Male,* 40 F.3d at 844.

■ There is a statutory presumption in favor of treating the offender as a juvenile. *United States v. A.R.,* 203 F.3d 955, 961 (6th Cir.2000). The government must overcome this presumption by establishing by a preponderance of evidence that the transfer is in the interest of justice. *See T.F.F.,* 55 F.3d at 1121–22. It has been held that "[i]t is incumbent upon the court to deny a motion to transfer where, all things considered, the juvenile has a realistic chance of rehabilitative potential in available treatment facilities during the period of his minority." *United States v. E.K.,* 471 F.Supp. 924, 932 (D.Or.1979). A "realistic chance" is more than a "futile gesture" toward rehabilitation, but denial of a transfer motion does not require the court to find that the transfer would *not* serve the interest of justice. *Id.*

■ In deciding whether a transfer would serve the interest of justice, Congress has directed the court to consider and weigh six factors:

1. The age and social background of the juvenile;

2. The nature of the alleged offense and the defendant's role in the offense; [4]

3. The extent and nature of the juvenile's prior delinquency record;

4. The juvenile's present intellectual development and psychological maturity;

5. The nature of past treatment efforts and the juvenile's response to such efforts;

6. The availability of programs within the juvenile system designed to treat the juvenile's behavioral problems.

18 U.S.C. § 5032. *See also A.R.*, 203 F.3d at 960. No one factor necessarily predominates, and the district court decides how much weight to give each factor. *See T.F.F.*, 55 F.3d at 1120.

### III.

#### A. *The age and social background of the juvenile.*

■ The age of the defendant is important in two respects. First, it determines, at least in part, how much time the defendant may be committed for rehabilitation in the juvenile system. Second, it is some measure of the defendant's development and maturity, although this question is explored more directly under another factor. In this case, the defendant will be eighteen years old at the time of commitment. Therefore, 18 U.S.C. § 5037(c)(2) authorizes commitment beyond five years, despite the fact that the defendant will attain majority in less than three years.

The defendant, along with two older brothers, was raised by both his parents in mid-Michigan until he was twelve years old. At that time, his mother left the

home permanently without prior warning and generally avoided contact with the defendant. Thereafter, he was raised by his father who was not well equipped to provide the sort of services the defendant needed. He enrolled the defendant in various remedial and counseling programs but then failed to follow up and repeatedly broke appointments with care and service providers.

The defendant's father took him to Indiana in August 1996, but returned with him five months later after he could not find work. The significance of this transience is its effect on interrupting social and psychological counseling services that the defendant needed.

It appears that the defendant was provided the basic necessities of food, clothing and shelter, but his social background was psychologically and emotionally impoverished.

#### B. *The nature of the offense.*

■ The government has charged the defendant with first-degree, premeditated murder, one of the most serious offenses known to the law. In adult proceedings, it carries a penalty of imprisonment for life, or death. 18 U.S.C. § 1111. The government argues that the serious nature of this charge should have predominating weight and of itself justifies transfer. Although the court *may* give preclusive weight to this factor, it need not do so. *See One Juvenile Male*, 40 F.3d at 846, and cases cited therein; *United States v. Doe*, 94 F.3d 532, 537 (9th Cir.1996). There are several examples in the reported cases of juveniles involved in criminal homicides in which transfer motions have been denied. *E.g., United States v. Leon D.M.*, 953 F.Supp. 346 (D.N.M.1996), *aff'd*, 132 F.3d 583 (10th Cir.1997)(seventeen-year-old

---

4. For the purpose of this analysis, the court may assume that the juvenile committed the

charged offense. *See One Juvenile Male,* 40 F.3d at 845.

charged with murder of battered three-year-old on Indian reservation); *Doe, supra* (seventeen-year-old charged with first- and second-degree murder, breaking and entering, theft and conspiracy where a police officer was beaten to death with his flashlight); *United States v. C.J.T.G.,* 913 F.Supp. 63 (D.P.R.1994)(sixteen-year-old charged with carjacking where a codefendant shot and killed victim); *United States v. M.L.,* 811 F.Supp. 491 (C.D.Cal.1992)(sixteen-year-old charged with first-degree murder in stabbing death of gang member).

In this case, the evidence shows that the infant died from craniocerebral trauma accompanied by extensive complex skull fractures. The infant also had multiple healing fractures of the extremities.

The defendant stated that he was at home with his father and the baby on September 8, 2000 while the baby's mother was at school. The defendant's father left to visit a relative. The defendant was then alone with the baby, who started crying "a lot." The defendant stated that he did not know what came over him; he dropped the baby on the floor six or seven times and might have slammed her head into the floor. When he realized the baby was injured, he retrieved an ice bag from the freezer and applied it to the baby's head. The baby was whimpering and he put her in her bassinet. When the defendant's father returned, the defendant called for emergency medical assistance, and the baby was transported to the hospital.

The crime, as horrible as it was, appears to be an act of uncontrolled rage. It was not motivated by personal gain, greed or avarice, but rather resulted from an apparent psychological reaction to circumstances with which the defendant could not cope. The nature of this offense weighs in favor of transfer, but it does not overwhelm the

other factors, all of which must be considered in the totality of the circumstances.

### C. *The extent and nature of the juvenile's prior delinquency record.*

The defendant's extensive history of contacts with the juvenile justice system began in July 1996 when his father filed a petition for incorrigibility. The defendant was thirteen years old at the time. The petition was dismissed when the defendant's father moved the family to Indiana. In September 1997, the defendant committed shoplifting and tobacco possession offenses. A few months later he committed three burglaries. Deann Crowley, a juvenile probation officer who had extensive contact with the defendant, described these offenses as "unusual." She explained that the defendant broke into hunting cabins and homes and stole small, insignificant items such as flashlights and cigarette lighters, when there were several more valuable items within obvious reach that could have been taken.

The defendant was charged with arson in April 1998 arising from an incident in his home, when he was on home confinement status wearing a tether. The defendant had requested a pass to attend a festival and his request was denied. He reacted by setting fire to the curtains in his bedroom.

In April 1999 the defendant broke into the home of his grandmother.

As a result of his various contacts, the defendant was placed in both non-secure and secure detention, home confinement on tether, and probation. He violated probation on seven occasions by committing various curfew and truancy violations, using marijuana, and removing his tether.

After the defendant and his family returned from Indiana, the juvenile contacts in the record occurred between September

1997 and October 1999. The defendant was referred to various counseling programs, which are discussed in detail below, and enjoyed only mixed success primarily due to lack of family or parental support. The record indicates, however, that he was "discharged from probation satisfactorily" on December 6, 1999, one month after turning 17 years old.

The defendant also has a state-court adult conviction for shoplifting resulting from an offense which was committed when he was 17 years old. He was sentenced to 12 months probation in the Isabella County trial court system, where the supervision resources are abysmal. The senior probation officer, Raymond Klaskowski, testified that historically three probation officers were assigned to work with a caseload of 400 probationers. Presently, however, Mr. Klaskowski supervises by himself a caseload of 752 probationers. In the defendant's case, Mr. Klaskowski only had a single contact with the defendant in eight months. Mr. Klaskowski testified, however, that the defendant had completed a shoplifter's alternative course and 24 hours of community service as ordered. Mr. Klaskowski testified that the defendant complied with everything he wished him to do. However, the defendant did not complete the schooling program, which was a condition of his probation, and was found to have possessed alcohol as a minor.

The Court finds that the defendant's significant and extensive history of juvenile contacts is an important factor, but it cannot be evaluated separately from the defendant's response to the treatment efforts that were part of the dispositional phase of the juvenile process. Although the record contains one incident in which the defendant became "enraged" and "verbally assaultive" to staff during a two-week period in non-secure detention during July

1999, the conduct generally does not describe a hardened criminal who is immune to rehabilitative efforts.

D. *The juvenile's present intellectual development and psychological maturity.*

Because of contacts initiated by the defendant's father, the defendant has been the subject of several psychological evaluations which predate the homicide in this case. Although counseling services were first sought by the defendant's father in 1995 when the defendant was 12 years old, the record describes a long history of missed appointments and failures to follow recommendations. Some reports suggest that the defendant's father's contribution to the situation has been to enable the defendant's behavioral problems.

The defendant was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and prescribed a course of medication. He saw a psychiatrist periodically at the Central Michigan Community Mental Health Services (CMCMHS) for medication monitoring, but as noted below, received no counseling. The contribution of the psychiatrist, Dr. Mitchell Osman, to the defendant's mental development can be summarized in the following exchange on the record:

Q: [by the government] And what are the types of things, if any, that you do in monitoring, if I may use that term, someone such as [the defendant] over a span of several years in between the visits, the face to face visits they pay to Central Michigan Community Mental Health.

A: Nothing.

Q: Literally nothing?

A: Correct.

Hearing Tr. at 121.

The record indicates that the defendant has average intelligence as measured by

I.Q. tests administered when he was 15 years old. Throughout his adolescence his behavior is described as "defiant" and "oppositional." He has a long school history of truancy and home history of sibling rivalry and fighting with his two older brothers. These problems have generally been attributed to the defendant's reaction to the trauma of being abandoned by his mother and exacerbated by his father's poor parenting skills.

The diagnosis of Oppositional Defiant Disorder recurs on periodic psychological assessments which also include Global Assessment Functioning (GAF)[5] ratings varying between 50 and 60, indicating moderate symptoms. The record is replete with recommendations for counseling, which was never provided for the reasons noted below. Dr. Osman commented in one report when the defendant was 16 years old that the juvenile court's program to address truancy—requiring his father to escort him to classes—was actually detrimental to the child's development and mental health. There is no indication in the record that this opinion was ever communicated to anyone; rather, the psychiatrist simply stated: "At this point, given the destructive nature of the present social arrangement, present medication will be continued. . . ."

The government offered testimony at the evidentiary hearing from two mental health professionals: Robert S. Cooper, a limited license psychologist who administered tests and interviewed the defendant for a three-hour period in March 1998, and Dr. Osman, the psychiatrist who monitored the defendant's medication. Mr. Cooper's contribution of relevant information was that the defendant was not retarded nor markedly impaired, and that he recommended that the defendant be placed in a residential program when he was 15 years old to help him learn to control his impulsivity and anger, which never happened. Mr. Cooper also stated, somewhat gratuitously, that "[t]hey're finding that aggression and anger is [sic] almost as stable as I.Q. . . . ." The Court places very little weight on this opinion because the source of the information was not identified, Mr. Cooper did not relate any personal experience or study upon which he could base such an opinion, and, with respect to the defendant, Cooper's experience and contact was quite limited.

---

5. The Global Assessment of Functioning (GAF) scale is reflected in Axis V of a differential diagnosis. "Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. This information is useful in planning treatment and measuring its impact and in predicting outcome. The reporting of overall [psychological, social, and occupational] functioning of Axis V is done using the Global Assessment of Functioning (GAF) Scale." *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM–IV)*, 30 (4th ed.1994). A GAF Scale of 70 to 61 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships; a scale of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with co-workers); a scale of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job); a scale of 31–40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

Dr. Osman testified that he saw the defendant sporadically beginning in April 1996 for medication review. The normal schedule called for a review every three months, but Dr. Osman's records indicate that he saw the defendant variously at three, six and nine month intervals. Although he gave prescriptions for medication refills that would have covered most of these spans, there were occasions when the defendant may have been without his medication. Dr. Osman stated that withdrawal symptoms generally do not occur when the type of medications which the defendant was taking were discontinued, but there would be an increase in moodiness, impulsivity and aggression.

Dr. Osman also stated that past violent behavior can suggest a tendency towards violence in the future. He stated that the defendant behaved violently and with poor impulse control since he was a child, based upon unverified reports from the defendant's father that the defendant threw mud at a school principal in the third grade, fought with other children in school, punched holes in the wall at home when younger, and enjoyed violent scenes, presumably on television.

The Court also heard testimony and received a report from Kim Seidel, the program coordinator at the alternative school which the defendant attended from August 1998 to June 1999. She stated that the defendant did better academically in the first part of the year than the second, and over all was absent 29 days. She characterized the defendant as respectful of others in group sessions, "rarely disruptive" and "socially immature." Her report included an intellectual assessment which stated that the defendant's I.Q. testing showed average intelligence. His language development was "immature," and he had "poor understanding of right and wrong." However, he demonstrated adequate abstract, numerical and memory skills which were necessary to succeed in academics. He performed in the "gifted" range in visual organization.

The thrust of the government's argument is that the defendant's psychological profile ineluctably points to future violent behavior, and therefore weighs in favor of transfer to adult status for the protection of the public. The Court agrees that it is important to consider the public interest in assessing this factor. The Court finds, however, that although the defendant exhibits intellectual capability based on standardized tests, he is psychologically and emotionally immature. Transfer to adult status, which would most likely lead to incarceration in prison with much more sophisticated and predatory adult inmates, would render possible future violent behavior by the defendant a certainty. The Court further finds that competent, consistent and thorough rehabilitation efforts could be effective, and therefore the defendant's malleable psychological and intellectual level of development weighs in favor of juvenile treatment.

E. *The nature of past treatment efforts and the defendant's response.*

There was extensive testimony at the evidentiary hearing about failed efforts to provide the defendant with counseling services since age twelve. Michelle McDonald, a social worker with CMCMHS, testified and brought the defendant's case file which was admitted as an exhibit. Ms. McDonald's duties include providing outpatient therapy. Although the defendant's file contained records dating back five years, Ms. McDonald had only one personal contact with him, and the defendant had only seven counseling meetings for the entire period. Ms. McDonald testified that typically counseling sessions occur weekly or bi-weekly. In November 1997, the defendant's out-patient counseling,

such as it was, was discontinued and he was simply monitored on his medication thereafter even though he had been recommended as needing counseling.

Deann Marie Crowley, a juvenile probation officer, also testified about the array of programs offered to the defendant. Ms. Crowley stated that the defendant had several juvenile adjudications and her first contact with him was in January 1998. She was the only probation officer who worked with him.

Ms. Crowley explained that her normal course of dealing was to form a "partnership" with the juvenile's family and to provide advice and recommendations for services that would benefit the juvenile. If the recommendations are not followed, then she takes remedial action.

In the case of A.F.F., Ms. Crowley testified that a major priority was to secure mental health services to address issues of social skills functioning, controlling impulsive behavior, controlling aggressive behavior, and increasing his academic performance. Ms. Crowley referred A.F.F. to CMCMHS, but these programs were never implemented for several reasons which, Ms. Crowley confirmed, were entirely out of A.F.F.'s control. The primary problem was that A.F.F.'s father never completed the paperwork necessary to initiate the programs.

There were work-school programs available to the defendant during the summer of 1998 and 1999 that would have allowed him to catch up on his schooling and earn some money in the afternoon hours. A.F.F. did not participate in these programs because, once again, his father neglected or refused to complete the paperwork and furnish the necessary documentation. Ms. Crowley tried to assist the father in several ways by furnishing copies of the forms when he lost them, giving him a bus pass to alleviate transportation problems, and explaining to him the importance of the programs. However, the father consistently failed to follow through.

Ms. Crowley referred A.F.F. for a substance abuse evaluation, which typically is completed within 21 to 30 days. A.F.F.'s father did not complete the referral for over a year.

When CMCMHS finally did get involved, it did not provide counseling services because the social worker claimed not to have enough information to develop a treatment plan. The information needed came from extensive sensory and psychological testing which was never performed because, again, A.F.F.'s father would continuously break appointments that were scheduled for this testing.

Ms. Crowley reported that A.F.F.'s father was ordered to show cause on two occasions by the family court for his failure to assist A.F.F. in complying with his probation and for his role in assisting his son in violating his probation. The father was found in contempt both times, but there is no record of subsequent compliance.

A.F.F. participated in two programs which produced positive results. During the 1998–99 school year, he was moved to a much smaller school program in an alternative school in which counseling services were integrated into the school day. Ms. Crowley testified that A.F.F. did quite well there and he was not involved in any behavioral incidents until the following spring, when he committed a curfew violation. During the summer of 1999, A.F.F. was placed on a tether. As noted earlier, he did not enter the summer work program because his father failed to complete the paperwork. A.F.F. started another alternative school program in the fall of 1999, but had attendance problems because of lack of transportation.

A.F.F. left home for two days in October 1999, and as a result Ms. Crowley placed him in a military academy program located in a rural area in mid-Michigan. The program was quite regimented; the students wore uniforms, marched in formation, drilled, engaged in physical training, and spent the day in school. Therapeutic intervention was included in the program, focusing on areas of self-esteem, responsibility and accountability. A.F.F. stayed in the program for 45 days and "did very well."

When A.F.F. was discharged from Ms. Crowley's supervision in December 1999, he still had not received mental health counseling despite a two-year effort to put those services in place.

The extensive history of past treatment efforts includes both successes and failures from which a demonstrable pattern emerges. When the defendant was referred to programs which required family participation, the efforts failed because of neglect and non-compliance by the defendant's parents. His mother had abandoned him and his father would not or could not provide the parental support and assistance necessary to initiate and continue the service. However, when the defendant entered programs which included mental health counseling and therapeutic intervention in a structured environment, he responded positively and the programs were successful. The Court finds, therefore, that the defendant responded to well to competent treatment, which he apparently needs. This factor weighs strongly in favor of juvenile rather than adult proceedings.

F. *Available programs within the juvenile system designed to treat the juvenile's behavioral problems.*

The government has directed the Court to the third sentence of 18 U.S.C. § 5039 which states:

Whenever possible, the Attorney General, shall commit a juvenile to a foster home or a community-based facility in or near his home community.

The government offered unrebutted testimony that there are no facilities in the mid-Michigan area that offer programs which could accommodate an eighteen-year-old charged with committing murder.

The defendant offered evidence that there are five facilities in the Midwest which contract with the Bureau of Prisons for the placement of older juvenile offenders charged with serious crimes including loss-of-life offenses. They are located in Wisconsin, Tennessee, Minnesota and North Dakota. All are maximum security facilities with perimeter fencing. All offer educational and vocational skills programs. Each one has a program for individual and group counseling, substance abuse, anger management, social skills and special needs. The facilities differ in the maximum age each one would keep a juvenile, from 20 years old to 25 years old, with one facility agreeing to treat and house a juvenile for as long as a court deemed necessary.

The record supports the finding that there are programs within the Bureau of Prisons that will accept a juvenile of the same age and charged with the same offense as the defendant and which will provide the programs necessary to treat the defendant's behavioral problems. Further the facilities provide psychological counseling integrated with residential placement in a secure setting, consistent with both the previous recommendations for treatment that were never followed, and the public interest.

IV.

In *United States v. Doe*, 871 F.2d 1248 (5th Cir.1989), the Court acknowledged

that rehabilitation is a priority in the treatment of juveniles within the criminal justice system, but that transfer to adult status is appropriate where juvenile treatment "would likely prove to be nothing more than a futile gesture." *Id.* at 1253.

The finding of rehabilitative potential is a test which is within the sound discretion of the trial court; that court may want more than a "glimmer of hope" that rehabilitation will be efficacious.

*Id.*

In this case, the nature of the crime and the defendant's history of juvenile contacts indeed cast a long shadow. However, the record also demonstrates repeated, failed attempts to deliver the psychological and rehabilitative services which the defendant needed, and that these failures were beyond the defendant's control. When the defendant did receive the benefit of continuous and structured programs, the positive responses measurably increased.

The Court is persuaded that there is a realistic chance that this defendant will benefit from rehabilitative programs that are available within the juvenile system during the time which this Court may order juvenile treatment. This is especially true when the programs involve residential placement, and accessibility to the program is not dependent on others who could or would not facilitate participation. For these reasons, the Court finds that the transfer of the defendant to adult status is not in the interest of justice. Accordingly, **IT IS ORDERED** that the government's motion to transfer proceeding to adult criminal prosecution is **DENIED.**